People v K.D. (2025 NY Slip Op 25055)

[*1]

People v K.D.

2025 NY Slip Op 25055

Decided on March 3, 2025

Supreme Court, Bronx County

Rosenblueth, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 3, 2025
Supreme Court, Bronx County

The People of the State of New York

against
K.D., Defendant.

Ind. No. 884/15

For Defendant: Rolando T. Acosta, Esq.
Briana Walsh, Esq.
Pillsbury, Winthrop Shaw Pittman LLP
31 West 52nd St
New York, New York 10019
Carola M. Beeney, Esq.
Center for Appellate Litigation
125 Wall Street
New York, NY 10005

For People:
ADA Tanya Apparicio
ADA Jennifer Russell
Bronx District Attorney's Office
198 East 161st St.
Bronx, New York 10451

Jeffrey Rosenblueth, J.

Defendant and the People move pursuant to CPL 440.47, the Domestic Violence Survivors Justice Act, (hereinafter "DVSJA") for an order vacating the sentence originally imposed under Indictment Number 884/15 for the conviction of the crime of Murder in the Second Degree, PL 125.25(1) and resentencing defendant pursuant to PL 60.12
 THE UNDERLYING CRIME
On March 9, 2015, at approximately 3:12pm, inside of 1064 Carrol Place, in Bronx County, the defendant stabbed her partner, Norberto Valentin Cruz, once in the chest with a knife, causing his death.

 PROCEDURAL HISTORY
On March 13, 2015, defendant was indicted for the crimes of Murder in the Second Degree in violation of PL section 125.25(1), Manslaughter in the First Degree, in violation of PL section 125.20(1) and Criminal Possession of a Weapon in the Fourth Degree, in violation of PL section 265.01(2) under Indictment Number 884/15.
On May 20, 2017, defendant was convicted, after a jury trial, of Murder in the Second Degree.
On May 30, 2017, defendant was sentenced by the Honorable Efrain Alvarado [FN1]
to an indeterminate term of imprisonment of 18 years to life. Defendant is currently serving her sentence at the Bedford Hills correctional facility.

DEFENDANT'S MOTION
On May 5, 2023, counsel for defendant filed a motion for resentencing under the DVSJA requesting that that defendant be resentenced to a reduced term of imprisonment pursuant to PL 60.12 because:
"a. [Defendant] suffered years of severe physical and psychological abuse by Mr. Cruz
b. The abuse [defendant] suffered contributed significantly to her behavior in this case, as Mr. Cruz physically abused her moments prior to his death . . . and "[i]f not for this history of abuse, [defendant] would not have stabbed Mr. Cruz on March 9, 2015". and
c. [Defendant's] sentence of 18 years to life is unduly harsh and was imposed without full consideration of her status as a victim of domestic abuse, and in consideration of other equities, such as her lack of criminal record and young age- twenty -three- at the time of the incident." (Walsh Aff, p. 5).
Prior abuse by Mr. Cruz
Defense counsel, citing from the trial record, elaborated that while living in Puerto Rico, on one occasion, Mr. Cruz returned home "on drugs" and struck [defendant] "a ton of times . . . like he was another person. Photographs Ms. D.'s sister took of the incident showed marks on [defendant's] face, bruises and marks around her eyes and ears, and injuries to the inside of her mouth (Trial Tr., at 785,789). [Defendant] testified that she did not report the incident to the local police because she believed that they would not be able to assist, and that she was in love with Mr. Cruz" (id. at 802).
According to defendant, the abuse escalated after the parties moved to New York and in the year prior to Mr. Cruz's death, "frequently punching [her] and one occasion, he followed her to the train and 'bit her on the nose'". (id. at 895-896). "In March 2014, less than one month after arriving in New York, Mr. Cruz followed [defendant] to [a job training] program . . . texting her [h]undreds of messages that . . . she was a whore [and] that he knew [she] was seeing someone there, (id at 807, 953,996). Mr. Cruz told [defendant] that he was going to attack [her] when he saw [her] because that's all you have to do, [to] whores. (id at 807). Terrified by the threats, [defendant] called the police . . . and went to the Manhattan District Attorney to make a complaint against Mr. Cruz. Mr. Cruz was then arrested and charged with Aggravated Harassment [attached to the defense papers is a New York State Domestic Incident Report, [*2]Criminal Court Complaint and Temporary Order of Protection]. The Criminal Court Complaint alleged that Mr. Cruz sent a text message to [defendant] stating" I am going to kill you; I am going to beat you up". The Manhattan District Attorney's Office arranged to relocate [defendant] to a domestic violence shelter on Long Island where she stayed for two- and one-half months. During that time, Mr. Cruz repeatedly called and texted [defendant]. [Defendant] eventually reunited with Mr. Cruz after he told her to "give him a chance". Defendant testified that she stopped cooperating with the prosecution because she "loved him . . . he was saying that he was going to change" (id at 814).
Subsequently, despite Mr. Cruz's promises, he "tightened his hold over [defendant], refusing to let her leave the apartment without his permission. Whenever [defendant] would leave for work, Mr. Cruz would walk her to the bus station and would wait for her at the station on her return home, preventing her from gaining any independence" (id at 792, 815). Further in the defense's mitigation report, it is alleged that Mr. Valentin-Cruz controlled every aspect of her life, including her clothing and became extremely possessive and suspicious that defendant was cheating. On one occasion, while [defendant] was at home cooking, the decedent "shoved his fingers into her vagina angrily, saying he needed to check and prove that she was not f*king someone else".
Further, "a prosecution witness at trial, [Ms. De Los Santos] testified that she saw Mr. Cruz hit [defendant] many times, including punching [defendant] in the face and splitting her lip, punching [defendant's] leg and leaving a bruise, and hitting [defendant's] backside with an open palm (id. at 394-95). On another occasion, [defendant] came to Ms. Los Santos's room with a bloody ear and testified that she saw Mr. Cruz throw [defendant's] bag onto the street almost every day" (id at 296). Additionally, the witness testified that "Mr. Cruz did not give her permission to go out, she did not leave" . . . that if he "didn't give her permission to work she couldn't work" (id. at 351,366-367) . . . [Defendant] "never left the [the house] if it [wasn't] with him" or with his permission (id. at 294,385).
Another trial witness, Melanie DeLeon, a childhood friend of [defendant], testified that [defendant] told her that Mr. Cruz didn't want her speaking with anybody and once observed, at a visit, [defendant] with "black and blue mark around her eye" and a "mark on her shoulder", (id at 719, 723-24). Additionally, another trial witness, Aurea Johanna Brazoban observed [defendant] with similar injuries which led Ms. Brazoban to allow [defendant] to live with her for 6 weeks (id at 702). During this period, Mr. Cruz continued to contact [defendant] and she felt conflicted about her feelings toward Mr. Cruz; she wanted to believe that he was going to change, (id at 824). After six weeks, [defendant] decided to return to Mr. Cruz after being told that he had been in the hospital, (id. at 823-824).. "A month after leaving Ms. Brazoban's apartment, [defendant] and Mr. Cruz had a fight, resulting in [defendant] staying at the apartment of Ms. Brazoban's sister for a week", (id at 709).
Day of Stabbing
"On March 9, 2015, [defendant] discovered text messages on Mr. Cruz's phone, indicating that he was 'having conversations with somebody' but 'could not see what was going on because everything ha[d] already been erased', (id. at 827-828). [Defendant] believed that he was talking to another woman and mentioned this suspicion to Ms. De Los Santos . . . [Defendant] confronted Mr. Cruz about the messages, telling him "If you want to be with another woman, go, leave me alone . . . In response, Mr. Cruz became aggressive, yelling "You whore, who do you think you are? (id. at 829). The confrontation escalated when Mr. Cruz [*3]punched [defendant] in the shoulder. Feeling threatened, [defendant] told Mr. Cruz that she was going to call the police, (id. at 830,998). In response, Mr. Cruz told her "Go right ahead" and grabbed her by the hair, dragging her around the floor and punching her in the head. (id at 830, 970,999) . . . . Mr. Cruz then brought [defendant] to the bed, put his knees on her shoulder and continued to hit her in the head as she said, "Let go of me, let go of me." (id at 830, 972-973 . . . [Defendant] testified that Mr. Cruz hit her several times until he got tired and left the room . . . [Defendant] . . . locked herself in the room . . . Mr. Cruz banged on the door and said: "Open the door for me, bitch, open the door because you'll see what's going to happen" . . . Mr. Cruz broke into the room using a knife to unlock the door . . . {Defendant] does not recall precisely what happened after Mr. Cruz broke into the room with a knife. She recalls grabbing Mr. Cruz's hand but does not remember what happened in the moments afterwards, (id at 832,979) . . . Following the incident, [defendant] instantly sought help. She called 911 and spoke to the operator while asking the other residents . . . to help Mr. Cruz".
In the defense's subsequent mitigation report, it acknowledges that "[t]he 911 call captured defendant saying "Die, die, die", in anguish". However, the defense claims that "In that moment, she was overwhelmed by a torrent of emotions. He had been beating her, and she was caught in a whirlwind of conflicting feelings . . . wanting to help him despite her anger, even though he was hurting her so terribly. She still does not fully understand why she said those words."
Additionally, although, prior to the stabbing, defendant posted on What's App, "I am like glass. If you throw me, I break. If you step on me, I cut you" Ms. D. now explains that her post meant: "by hurting the person you love; you are actually hurting yourself".
After the defense motion was filed, the People indicated that they would possibly consent to relief under the DVSJA and as such, defendant's May 5, 2023 motion was withdrawn. Subsequently, conversations between the parties resulted in the prosecution agreeing that defendant had satisfied the three prongs of the DVSJA, namely, that she had proven that (a) she was the survivor of substantial domestic abuse at the time of the offense; (b) the abuse was a significant contributing factor to her criminal behavior and (c) her sentence was unduly harsh (PL 60.12).
On December 14, 2023, a proffer session with defendant and members of the Bronx District Attorney's occurred which lasted for approximately 5 hours. After the proffer, the prosecution informed the defense that it would be recommending that defendant be resentenced to a term of imprisonment of 13 years and 5 years post-release supervision. The defense was seeking a resentence to 9 years' incarceration and 5 years post-release supervision. At the time, defendant had already served approximately 9 and ½ years of her 18-year sentence and therefore, such resentence would be equivalent to "time served".
On May 23, 2024, since the People and the defense were unable to reach an agreed upon recommendation for resentence, defense counsel refiled their motion for resentencing under the DVSJA.

THE PEOPLE'S RESPONSE
On May 31, 2024, the People, consented to defendant's motion by stating that they "agree[d] that defendant is eligible for a reduced DVSJA sentence. After a careful review of the trial record, the facts and circumstances of the incident, defendant's DVSJA Application and exhibits, an in-person meeting held with the defendant at the District Attorney's Office on [*4]December 14, 2023, and extensive conversations with the decedent's family, the People recommend that defendant be resentenced to 13 years of incarceration and five (5) years post- release supervision." (Apparicio, Aff p. 4)

DEFENDANT'S MITIGATION REPORT
On September 3, 2025, the defense filed a mitigation report which indicated, in pertinent part:
[Defendant's] Background and History of Relationship with Mr. Cruz-Valentin
Prior to living in New York, [defendant] spent most of her life living in the housing projects of Humacao, Puerto Rico, which is known for its constant violent crime. [Defendant] was raised by a single mother. [Defendant's] biological father refused to accept her as his daughter which caused her to suffer deep emotional distress and adversely affected her future relationships. Additionally, defendant's stepfather was arrested and served 18 years in prison.
Defendant attended the Industrial Technical College in Humacao where she studied to be a beauty technician. There she excelled and got a job working in a nail salon. At the insistence of Mr. Cruz, defendant reluctantly agreed to move to New York, where the decedent's mother was living. Once in New York City, [defendant] found herself dependent on Mr. Cruz. She did not know anyone in New York, except the decedent's family, did not speak English and had no way of supporting herself. Soon after moving in with the decedent in Puerto Rico, he began to physically abuse her. [Defendant] acknowledges that they were constantly fighting. She remembers one violent episode left her bleeding from her ear and blood dripping down her face.
The mitigation report also substantially reiterates, as set forth in defendant's motion, the events on the day of the stabbing.
[Defendant's] Learning and Growth Since Her Incarceration:
[Defendant] laments that she is filled with remorse, has gained tremendous insight into her past through the programs that she has participated in, including anger management, domestic violence, de-escalation techniques, walking away from violent situations and the importance of valuing herself. Attached to the mitigation report are copies of the many Certificates of Achievements from these programs. [Defendant] is proud that she was also elected president of her unit at Bedford Hills. In retrospect, she acknowledges that on the day of the stabbing she "failed" and would not act the same way again. Specifically, [defendant], who is now 32 years of age and incarcerated for almost 10 years, states that she "understands her triggers, how to control her emotions, and how to walk away". [Defendant] aspires to be a counselor to support survivors of domestic violence. [Defendant] is also diligently working to get her GED.
Defendant's Relocation Plan Upon Release from Prison
Letters from family members indicate that [defendant] has maintained strong ties with a broad family network of hard working and law-abiding individuals who are ready to provide both financial and emotional support upon her release from prison. Specifically, [defendant] intends to live with her sister, Meredy Lopez Gonzalez, in Huron, South Dakota. Defendant's sister lives in a three-bedroom house and Ms. D. would have her own room. Ms. Lopez Gonzalez is eager to assist defendant financially and emotionally during the transition period. In [*5]addition to defendant's sister, other family members live in Huron, South Dakota including her mother and cousin, Sau-Mei Ramos Silva. Ms. Ramos Silva is studying to obtain her South Dakota nursing license and previously worked as a nurse in Puerto Rico. She currently works as a community health care worker, providing transitional housing services, re-entry services, job training, medical referrals and other necessities for those in need. Ms. Ramos Silva was also named the 2024 South Dakota Community Health Worker of the Year, (attached to defendant's submission are press releases of Ms. Ramos-Silva's achievements). Ms. Ramos-Silva promises to apply her professional experience to provide additional resources for [defendant] to facilitate her reentry into society. Additionally, there are several resources in Huron, South Dakota to assist defendant including employment search, support groups, domestic violence and reentry services.
The defense relocation package also sets forth that, in the event, defendant's supervised release cannot be transferred to South Dakota, defendant has been accepted to live at the Providence House Women's Justice residence in New York City. This facility has a 24-hour onsite staff, including a nurse practitioner. Ms. D. would be assigned a social worker, housing specialist and case manager and would participate in a weekly onsite dialectical behavioral therapy group. Additionally, Sanctuary for Families' Economic Empowerment Program, (EEP) will help [defendant] qualify for stable jobs by helping her to build literacy skills, computer skills and professional goals.
STIPULATION OF FACTS BETWEEN THE PEOPLE AND THE DEFENSE
On November 22, 2024, the parties submitted to the Court a written stipulation consisting of relevant portions of the trial testimony and a summary of the proffer session between the defense and the Bronx District Attorney's Office.

PEOPLE'S SUPPLEMENTAL RESENTENCE MEMORANDUM
On December 10, 2024, the People submitted a supplemental memorandum to support their resentencing recommendation. In part, citing from the trial transcript, the prosecution highlighted the evidence of defendant's guilt in the stabbing of the decedent, including that (1) the victim suffered a deep stab wound to his chest that was one inch wide and penetrated approximately three inches into his chest, which punctured the front and middle parts of his heart; (2) the decedent had no other stab or incision wounds on his arms or hands that would indicate or corroborate that any struggles occurred during defendant's assault with the knife; (3) after stabbing the decedent, defendant called 911, where she not only admitted to the stabbing, but also repeatedly yelled "Die, die, die, die" to Mr. Cruz as he laid bleeding on their bedroom floor (Trial Transcript, 177, 179,207); (4) defendant made no attempt to stop Mr. Cruz's bleeding and never applied any pressure to the wound; (5) defendant's roommate observed [defendant] in the kitchen, attempting to hide the evidence by washing the knife she used to stab Mr. Valentin Cruz (id. at 559-560); (6) when the police later arrived at the scene, they recovered the knife, with a 5.5 inch long blade from the kitchen floor, (id at 496,498-499,510,512,530); (7) according to defendant, both at trial and in her proffer, she did not remember any details regarding how she obtained the knife and stabbed the decedent; (8) defendant's testimony at trial about the circumstances leading up to the murder were not corroborated by the other residents of the apartment who were present at the time of the stabbing; (9) although defendant claimed that, [*6]prior to the stabbing, the decedent punched her more than 50 times about the face, head and body, none of the other residents nor the investigating detective, observed any visible bruises, cuts, swelling or marks on defendant's face or body, and her clothes were not ripped or torn, (id. at 169, 560-561); (10) at the time of stabbing the defendant was significantly larger than the victim. In March 2015, the defendant was 5'7" and approximately 210 pounds while the decedent was 5'5" and weighed 169 pounds; (11) prior to the incident, defendant caught the decedent sending intimate messages to another woman on Facebook and she told other persons that she was tired of Mr. Cruz-Valentin's behavior; (12) one hour before the stabbing, in an angered state, defendant changed her Whatsapp profile picture to the phrase "Mejer tener fama de carbona que de pendeja:, which means, "Better to be known as a bitch than as an idiot". Further defendant also changed her account status to "I am like glass. If you throw me, I break. If you step on me, I cut you", (id. at 98-109).
In characterizing the nature of the parties relationship before the murder, the prosecution states that "[a]s described at trial and discussed during our proffer, the defendant and victim argued often and at times physically assaulted each other(id. at 85-87,117-120, 158-159,197-200,290,293,298-299,313,415,598-599,616) . . . it is undisputed that the defendant and the victim had an unstable, jealousy-ridden, and at time, a violent relationship . . . even at sentencing [defendant's] attorney acknowledged to the court that 'there was true a very volatile, dangerous jealousy that existed between both parties to this case', (Sentencing Transcript at 10) ".
Notwithstanding the above, significantly, the People "credit defendant's overall narrative regarding her volatile relationship and her status as a victim of domestic violence".
Additionally, although, the prosecution commends defendant's rehabilitative efforts while incarcerated, they also point out that defendant has had 14 disciplinary incidents at Bedford Hills Correctional Facility. These infractions have included interfering/violating a direct order, being out of place, making physical contact and possessing unauthorized medicine.

 THE RESENTENCING HEARING
On January 14, 2025, the Court conducted a resentencing hearing.
Defense counsel's statement
Counsel for [defendant], Rolando Acosta, Esq. recommended that defendant be resentenced to "time served" with five years of post-release supervision. In doing so, he summarized the incidents of domestic abuse that she suffered during her relationship with the decedent, as well as the events on the day of the stabbing, as indicated in the defense written submissions.
Counsel further stated, in pertinent part, that [defendant] is "deeply remorseful and has taken steps throughout her time of incarceration to reflect on her mistakes, what she could have done differently, and how she would approach her life post release". Specifically, "[Defendant] has served nearly ten years in prison where she has received overwhelming positive progress reports in all of her programming including those related to domestic violence. She has learned English. She also recently . . . passed her adult basic education test . . . she has spent her time in prison availing herself of opportunities for self-improvement, obtaining work experience, advancing her education and completing recommended rehabilitative programs . . . ".
In conclusion, in support of his sentencing recommendation, counsel added that: defendant "has no criminal background prior to this offense and has taken steps to educate herself about domestic violence and abuse so that she can avoid it in the future. She has matured greatly while in prison and has developed concrete goals for reentry . . . she is exactly the type of [*7]individual contemplated by the legislature when it passed this [DVSGA] bill and . . . [was] signed into law" (see Resentencing Hearing Tr., p.5-15).
Defendant's Statement
{Defendant], emotionally read a statement to the Court, in which she apologized to Mr. Cruz's mother for the loss of her son and asked for her forgiveness- " I am so sorry for what you have suffered, for causing you to lose your son because of what I did . . . I cannot imagine the pain you must have felt at the death of your son . . . I go through life with regret and remorse for how I changed your life, for the sadness that I created [for] you to live with".
[Defendant] then recounted the history of abuse that she suffered during her relationship with Mr. Cruz, as described in defense counsel's motion papers. Additionally, [defendant] alleged that (1) on "3 or 4" occasions after Mr. Cruz became jealous of her speaking with others, he broke her phones but would then apologize and replace them; (2) the decedent broke her iron and hair dryer and threatened to kill her if she "walked out"; (3) during one fight, Mr. Cruz stabbed her hand with scissors and stated "You can still see the scar"; (4) the decedent once punched her in the face so hard that he broke her tooth; (4) Mr. Cruz hit her with a broom and a heeled shoe on her head and body, causing her a black eye and bruises and (5) one day when she was participating in a "Back to Work Program", defendant sent hundreds of texts which included threats to kill her and that he was "going to get a muzzle for my face, like a dog". [FN2]

[Defendant] then recounted the events on the day of the stabbing, as set forth in the defense submission. [Defendant] concluded, in pertinent part: "Today, almost ten years later, I have learned so much . . . I think before I speak and before I act. I am more mature now . . . After taking classes in anger management, abuse and domestic violence, I understand that there were options for me that I did not fully understand at the time when I was new in New York and did not even speak English. I know better now . . . I wish that I would have handled things differently. Now I understand how important it is to walk away from violent situations. I understand the importance of valuing myself. I know how to protect myself mentally and physically and I know I failed . . . I am not the person I was when I was sentenced . . . I hope that my plans for my life after prison show you that I am serious about my career and goals, that this will never happen again . . . " (see id. at p. 15-27).
Victim Impact Statements
Gary Collins, the decedent's stepfather first described the nature of the relationship between defendant and Mr. Cruz when they were living with him and his wife, the mother of the decedent. "I . . . noticed within a couple of days of them living with us that they had a tumultuous relationship. They were always arguing. It was back and forth. It wasn't, you know, one sided . . . Norby wasn't a big guy. She was noticeably bigger than Norby . . . she wasn't like this diminutive statured person who was a shrinking violent . . . I have seen her aggression and how she—in her own words, the day that she stabbed him, they were fighting...so you are big enough and you are strong enough to take a knife from him and use it on him". In all actuality, they [were] victims and they both [were] perpetrators." As to [defendant's] moving into a [*8]domestic violence shelter Mr. Collins cast his doubt on defendant's motives in doing so by stating that " . . . I heard that her friend had told her that one way that you can get an apartment easily and quickly is to go into a shelter . . . use the system and say you are a domestic violence victim. Regarding the veracity of defendant's allegations of domestic violence between the parties in Puerto Rico Mr. Collins stated: "You have been abused all this time and you never called the cops . . . But the one time that you are trying to use the domestic violence system to get you an apartment is the one time you call the cops on Norby. So that, to me, is kind of disingenuous".
Finally, Mr. Collins described the anguished reaction that the decedent's mother had upon learning that Mr. Cruz had died: "When she found out that Norby was dead, that scream, that blood-curdling scream that she let out knowing that her son was dead was something I would never forget and it broke my heart" (see id. at p. 27-35).
Mr. Cruz's mother, Janet Cruz was present at the resentencing hearing on January 14, 2025. However, Mr.Collins explained that she "won't be able to get through" reading her victim impact statement. As such, Mr. Collins read Ms. Cruz's victim impact statement, which states, in sum and substance:
"How can a mother truly convey in words the pain of losing a child? The pain is so profound. Your heart hurts and you feel your own life is over. Your mind cannot really comprehend what is happening. It is an overwhelming feeling of emotion, mentally and physically. Each day gets harder to understand and accept that reality. On March 9, 2015, my beloved son, Norberto Valentin, was taken from us. He was killed with a knife to the heart. Even worse, as my son was gasping for his life, he was taunted and told to die already. The depravity, the cold heartedness, the disregard for human life. What kind of human being can to this to another human? This tragic event shattered my world and left an irreparable void in me and my family's lives . . . I feel a profound sense of emptiness, sorrow and despair. There are days when the shock and disbelief are overwhelming, and I often find myself questioning how I can possibly go on without him. The joy I once felt in my life has been replaced by a constant ache in my heart . . . The loss of Norberto Valentin has also deeply affected our family. We have struggled to support one another throughout grief and tensions have risen as we cope in different ways. Family gatherings that once brough us joy are now marred by the absence of my son. I worry about the long-term effect of his loss on my other children and the relationships we share every day . . . Routine activities feel hollow and the little things that once brought happiness serve as painful reminders of his absence. I often find it difficult to focus on daily responsibilities and even simple tasks can feel insurmountable. The world feels less vibrant, and I struggle to find meaning in life without him . . . The only solace we were able to get from this tragedy was that someone was held accountable for what they did and for us to feel like that they are again trying to use a system that was designed to help real victims of domestic violence is just a slap in the face" (see id. at p.35-38).
Jerry Valentin, the decedent's biological father submitted a written victim impact statement which reads, in sum and substance:
"Through the years we have endured immense suffering due to the loss of my dear son, Norberto Valentin . . . We have heard rumors about the possibility of awarding his killer an anticipated release before she can serve her sentence. This prospect causes us unspeakable anguish. From our view, this is not a matter of justice. This is a cruel reminder of the life that was taken from my beloved son and the suffering that his siblings, my wife, and I have [*9]experienced during all of these years in his absence. The decision of releasing the person who took the life of my son without any mercy would be disrespectful not only to the memory of my son, Norbert Valentin, but would also be disrespectful to all of whom have been affected by this horrendous crime" (see id. at p. 38-40).
The People's Statement
With respect to the additional allegations that [defendant] described in her statement to the Court, as indicated in the above footnote, the People expressed their dismay that despite the 5 hour in person proffer conducted with defendant in the Bronx District Attorney's Office, her "allegations [with respect to prior domestic violence] have now expanded to something more serious and her own responsibility with regard to the actual criminal act is now minimized over time . . . Even in our meeting, [defendant] took more responsibility than she is taking now . . . In our conversations with her she talked about how she played a much larger role in their tumultuous relationship, that they argued all the time. There is testimony from the trial that we discussed that she was assaulting Norby as well. She would often put her hands on him . . . So what is troubling to us is . . . the lack of responsibility that she takes in their relationship in total. In our conversations with her, we also discussed the incident. She had essentially told us that she blacked out. She didn't really know what happened. The version of events that she gave at trial and has given now is disproved by testimony that was given a trial.
Despite the foregoing, the People maintain that they "have always credited [defendant] and her status as a victim of domestic violence" and that based upon all the facts in this case a resentence to 13 years prison plus 5 years post-release supervision would be appropriate (see id. at p.40-55).

 CONCLUSIONS OF LAW
After careful consideration of the parties' written submissions, the stipulated facts, the statements made at the resentencing hearing and the relevant law, the Court makes the following conclusions of law:
On May 14, 2019, the Domestic Violence Survivors Justice Act ("DVSJA") was signed into law, amending Penal Law section 60.12 by authorizing the imposition of alternative sentences for survivors of domestic violence and enacting Criminal Procedure Law 440.47, providing a procedure by which these same survivors of domestic violence who are currently incarcerated may apply to be resentenced.
CPL section 440.47(1)(a) provides, in pertinent part, that:
" . . . [A]ny person confined in an institution operated by the department of correction and community supervision serving a sentence with a minimum or determinate term of eight years or more for an offense committed prior to the effective date of this section and eligible for an alternative sentence pursuant to section 60.12 of the penal law may, on or after such effective date, submit to the judge or justice who imposed the original sentence upon such person a request to apply for resentencing in accordance with section 60.12 of the penal law.
Penal Law section 60.12(1) sets forth in relevant part that:
" . . . the court, upon a determination following a hearing that (a) at the time of the [*10]instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the defendant . . . (b) such abuse was a significant contributing factor to the defendant's criminal behavior; (c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, that a sentence of imprisonment pursuant to section 70.00, 70.02, 70.06 or subdivision two or three of section 70.71 [of the Penal law] would be unduly harsh may instead impose a sentence in accordance with this section . . . A court may determine that such abuse constitutes a significant contributing factor . . . regardless of whether defendant raised a defense pursuant to article thirty-five [defense of justification], article forty, or subdivision one of section 125.25 of this chapter [defense of extreme emotional disturbance] . . . At the hearing to determine whether the defendant's resentence pursuant to this section, the court shall consider oral and written arguments, take testimony from witnesses offered by either party, and consider relevant evidence to assist in making its determination . . . Reliable hearsay shall be admissible at such hearings".
In the instant matter, notably, the People concede that defendant is eligible to be resentenced under the DVSJ. Thus, the People agree with the defense that (1) at the time of the commission of the offense defendant was a victim of domestic violence subjected to substantial physical and/or psychological abuse; (2) such abuse was a significant contributing factor to her commission of the offense and (3) the original sentence imposed in this matter is unduly harsh (PL 60.12; CPL 440.47). However, since the litigants cannot agree on their recommendations for resentence the sole legal issue to be decided by this Court is the appropriate term of imprisonment. Inasmuch as defendant was convicted of Murder in the Second Degree, a class "A-1" felony, the statutorily authorized resentence is "a determinate term of imprisonment of at least 5 years and not to exceed 15 years" [PL 60.12(3)]. [Defendant] has already served approximately 10 years of her original 18-year sentence. 
Here, based upon all the submissions of the parties including the stipulated facts, it is clear that prior to the fatal stabbing, the parties had a volatile relationship consisting of constant verbal altercations, physical violence, and a persistent streak of jealousy on both sides. [FN3]
However, the salient fact, as acknowledged by the prosecution and germane to the DVSJA, is that defendant was a victim of a pattern of domestic violence (see People v. Theresa G., 78 Misc 3d 1139; People v. S.M, 72 Misc 3d 809; People v. Smith, 69 Misc 3d 1030). Indeed, their relationship reflected the well-established dynamics of domestic violence - the desire to control the victim by isolation, fear and violence which was then followed by the intimate partner's apologies with promises to change one's behavior. This would then result in the hopeful expressions of forgiveness from the victim and then, sadly, a regression and repeat of the same toxic chain of events (see http://sdus.ie/the-cycle-violence/).
Whatever was the immediate cause of Mr. Cruz's death [FN4]
, "[r]esearch has shown that domestic violence exacts a heavy psychological toll on its victims, impacting their states of mind, making them 'hypervigilant to cues of impending danger' that would go unrecognized by someone who had not suffered abuse, increasing their perception of danger and causing them to act impulsively", id. at 1038, citing Lenore E.A. Walker, Battered Women Syndrome and Self Defense, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321, 328 [1992]").
Thus, the DVSJA was intended to give the courts discretion to ameliorate the harsh effects of lengthy mandatory sentences for victims of domestic violence where, as here, that violence was a significant factor to a defendant's criminal behavior (see id at 1040).
At the same time, this Court is cognizant that "The DVSJA was never intended to hold a defendant blameless for her actions or excuse her criminal conduct. It instead both recognizes the severity of an offense while also affording some measure of mercy for the offender", id.; (see also People v. Burns, 207 AD3d 646).
Based on the foregoing, in determining the appropriate resentence, the Court has taken into consideration, the following factors (1) the extremely serious nature of the crime, Murder in the Second Degree, resulting in the loss of life of another human being; (2) the strong evidence of defendant's guilt at trial; (3) the devastating emotional anguish suffered by the family of the decedent, Mr. Cruz.; (4) {Defendant's] expressions of deep remorse for the tragic events that occurred on March 9, 2015; (5) [Defendant's] status as a survivor of uncontested domestic violence which was a significant contributing factor to her criminal behavior; (6) the young age of {defendant], 23, at the time of the commission of the crime; (7) defendant's lack of any contact with the criminal justice system prior to the commission of the crime, with the exception of a minor theft related offense in Puerto Rico when she was 15 years of age; (8) [Defendant's] diligent efforts at rehabilitation and her achievements relating to her participation in educational and therapeutic programs during the last 10 years of incarceration; (9) [Defendant's] challenging and often troubled childhood including the total abandonment of her biological father; (10) the strong support of defendant's family network, namely, her mother, sister and cousins and (11) the detailed relocation plans and comprehensive services available for defendant upon her release from prison which would facilitate a stable and productive reentry into society.
Accordingly, after balancing the above factors, apportioning the equities therein, and considering the recommendations of both parties, the Court concludes that the original sentence imposed of 18 years to life is unduly harsh (PL 60.12) and that the appropriate resentence consistent with the intent of the DVSJA and the interest of justice is a determinate term of imprisonment of 11 years, to be followed by 5 years of post-release supervision.
This matter is adjourned to March 4, 2025, in Part 31, for the Court to vacate the sentence [*11]originally imposed on May 30, 2017 and to order the resentence in accordance with this decision.
This constitutes the decision and order of this Court.
Dated: March 3, 2025
JEFFREY ROSENBLUETH, A.S.J.C.

Footnotes

Footnote 1:Justice Alvarado has since retired.

Footnote 2:At the hearing, the People expressed their surprise that this was the first time they were being informed about these additional allegations since defendant never mentioned these incidents during their in-person proffer with Ms. D., which lasted for approximately 5 hours.

Footnote 3:At trial defendant testified that both she and Mr. Cruz were jealous and suspicious that the other was cheating from the beginning of their relationship, (id at 930,937-938).

Footnote 4:The statutory language in the DVSJA, as previously referenced, does not require that a defendant raise a justification defense or that the domestic violence abuse occur at the same time of the instant offense (PL 60.12; CPL 440.47; see also, People v. Liz L, 221 AD3d 1288; People v. S.M., 72 Misc 3d 809; People v. Addimando, 67 Misc 3d 408). Moreover, "the DVSJA resulted from the legislature's second attempt 'to provide a more compassionate sentencing scheme for survivors of domestic violence who committed offenses related to that abuse' even where a jury, [as in defendant's case] has rejected a justification defense", People v. Partlow, 216 AD3d 1469).